STATE of Missouri, Plaintiff-Respondent,

v.

David Joe ADKINS, Defendant-Appellant.

No. 36850.

Missouri Court of Appeals,
St. Louis District,
Division Two.

May 11, 1976.

Lawrence O. Willbrand, St. Louis, for defendant-appellant.

Preston Dean, Asst. Atty. Gen., Jefferson City, Jack Gallego, Pros. Atty., Troy, for plaintiff-respondent.

DOWD, Judge.

Defendant appeals his conviction for second degree murder. § 559.020 RSMo 1969. The jury fixed his punishment at 75 years imprisonment. We affirm.

The jury could have reasonably found that on April 15, 1974, the defendant and Miss Debbie Heitman, the deceased herein, were students at the same high school, which recessed at 3:15 p. m. Shortly after 3:30 p. m., Mrs. Jean Meyer noticed a car parked in the gravel driveway in front of her house. The deceased was seated behind the steering wheel and the defendant occupied the passenger's side, where the door was ajar. The occupants were "slapping at one another at arms length." Mrs. Meyer thought it was necessary to notify someone that "something strange" was occurring so she called her mother, as she continued to observe the car and its occupants. After the slapping the defendant *emerged* from the auto. When he *reentered,* the struggling resumed and the horn sounded. Mrs. Meyer then realized that the struggle was serious and agreed that her mother should call the sheriff. The defendant alighted from the auto again, looked around, and fled. As he ran from the car, Mrs. Meyer saw a flash and thought the defendant was carrying a knife. She made several attempts by phone to obtain additional help, but failed to reach anyone. Within moments, Mrs. Meyer halted some neighbors who were returning home, and with their assistance an ambulance was summoned. Defendant could still be seen running in the distance.

The sheriff arrived and observed the deceased lying on the front seat of the auto, covered with blood. One breast was exposed and the zipper of her slacks had been torn loose. Mrs. Meyer quickly related what she had observed. She gave a description of the defendant and indicated to the sheriff the direction in which he was seen running. The sheriff pursued the defendant to the railroad tracks. Using the patrol car speaker, the sheriff identified himself and ordered the defendant to halt, but the defendant threw a glowing object (later retrieved and identified as a knife), and continued to flee. Following a continued pursuit and repeated orders to stop, the defendant was apprehended. He attempted to discard a wet and blood-stained handkerchief but the sheriff told him to put it back into his pocket. The defendant was sweating and had blood smeared from his hands to his elbows.

The sheriff and defendant returned to the Meyer residence where defendant was identified without hesitation. He was placed in the custody of the deputy. The defendant then informed the deputy as to where he threw the knife and together they retrieved it. The knife's leather sheath was recovered outside of the auto, near the open door of the passenger's side.

The deceased was transported to the hospital and examined by the emergency room surgeon, the coroner, and the chief medical examiner. It was found that her blouse had multiple tears and was pulled to her neck. The zipper of her slacks had been torn open. She had multiple stab wounds of the face, neck, chest and abdomen, with the massive bleeding due to a deep stab of the left jugular vein, penetrating through the carotid artery. The arms and hands also showed slash wounds: on the posterior side, in the palm, and in the armpit. In total, there were approximately 30 stab wounds randomly directed in a 360 degree distribution around the body. The wounds were classically recognized as those experi-

enced in a struggle, as though warding off or defending oneself.

Numerous character witnesses testified to the defendant's reputation for peacefulness and good conduct. None had seen him on the day in question. On his own behalf, the defendant offered testimony of complete innocence of the crime. He stated that when he left school on the day in question all the busses had left the premises. On previous occasions, he always called his father for a ride. On this day the defendant hitchhiked. He was dropped off at the road leading to the Meyer residence, which was about a mile before the road on which defendant lived. The driver, however, continued in the direction of the road leading to defendant's house. Defendant noticed that the car in front of the Meyer house had the motor running. As he looked in he observed the victim covered with blood. He felt for a pulse, as he learned to do in a first-aid course. He then walked to the other side of the car, seized the knife, and fled from the scene. He explained that he did not attempt to obtain help at any of the nearby houses because he did not know if anyone was at home. Defendant denied having any blood on himself when he was apprehended, but this was rebutted by testimony from the sheriff and expert police laboratory witnesses. Additional State's evidence also indicated that the defendant was seen walking toward the school parking lot when the busses were still parked on the premises. Other rebuttal witnesses followed.

The court instructed on first and second degree murder, rejecting defendant's request for instructions on manslaughter and self-defense. The jury found defendant guilty of second degree murder and fixed his punishment at 75 years imprisonment.

■ Defendant makes no contention that the evidence was insufficient to support a conviction of second degree murder. His first assertion on appeal, however, is that the court erred in refusing to instruct on manslaughter. Defendant argues that *State v. Ayers,* 470 S.W.2d 534 (Mo. banc 1971), as quoted in *State v. Stapleton,* 518 S.W.2d 292 (Mo. banc 1975), requires the court to instruct on manslaughter in second degree murder cases on the basis of the evidence which supports a second degree murder instruction. It is correct that where the pleadings and evidence warrant the submission of first degree murder in homicide cases tried after March 1, 1975, additional instructions on second degree murder and manslaughter must also be given to the jury. See MAI–CR 6.02, Notes on Use 6. However, contrary to defendant's assertion, "this requirement was not instituted by *Ayers.*" *State v. Mudgett,* 531 S.W.2d 275, 281 (Mo. banc 1975). The automatic submission requirement is prospective in application only, and does not apply to cases tried prior to March 1, 1975. *State v. Mudgett, supra; State v. Eiland,* 534 S.W.2d 814 (Mo.App., 1976). The homicide and trial in this case occurred prior to March 1, 1975, and, therefore, we do not apply the "automatic submission" requirement.

■ At the time of trial in the instant case it was the duty of the trial court to instruct on lesser degrees of homicide unless the court could declare, as a matter of law, that there was no evidence to support such submission. *State v. Ayers, supra,* 470 S.W.2d at 538. Whether the defendant was entitled to a manslaughter instruction "depends on whether from the evidence introduced the jury could have found that he unjustifiably and inexcusably killed deceased without premeditation or malice." *State v. Anderson,* 515 S.W.2d 534 (Mo. banc 1974).

■ The record in the present case demonstrates that if defendant's evidence is to be believed, he is not guilty of any offense. However, if the State's evidence is accepted, the acts are consistent with murder only. " . . . When a homicide is committed in circumstances of great barbarity and cruelty, such brutal malignity will supply the place of malice, and make the act of killing equivalent to a deliberate act of slaughter . . . " *State v. Duestrow,* 137 Mo. 44, 38 S.W. 554 (1897). Also, the Supreme Court in *State v. Mudgett,* cited

with approval *State v. Clough,* 327 Mo. 700, 705, 38 S.W.2d 36, 38 (Mo.1931) where the court in *Clough* said:

"The authorities are fairly harmonious in holding that, in order for a homicide to be reduced from murder to manslaughter, there must be a sudden unexpected assault, encounter, or provocation tending to excite the passion beyond control. It is not the assault or the provocation alone that reduces the grade of the crime, but it is the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements of malice and deliberation necessary to constitute murder are absent, and therefore the crime is not murder, but manslaughter . . ."

Here the evidence does not support "a sudden unexpected assault . . . tending to excite the passion beyond control." The slapping episode had terminated and the defendant had emerged from the auto. At this time the victim was still alive. The defendant then reentered the auto and engaged in a second struggle with the victim.

Accordingly, we declare, as a matter of law, that there is no evidence which would tend to support a verdict of manslaughter. Therefore, the trial court correctly refused to submit an instruction on manslaughter.

Defendant's second contention is that the trial court erred in refusing to instruct on self-defense. This court recently reiterated in *State v. Young,* 510 S.W.2d 732, 734 (Mo.App.1974), the requisite proof necessary to support an instruction on self-defense, as held by the Missouri Supreme Court in numerous decisions:

" . . . This quantum of proof has been variously defined as 'substantial evidence,' *State v. Rose,* Mo., 346 S.W.2d 54; *State v. Baker,* Mo., 277 S.W.2d 627; *State v. Singleton,* Mo., 77 S.W.2d 80; 'evidence putting it in issue,' *State v. Ford,* 344 Mo. 1219, 130 S.W.2d 635; 'any theory of innocence . . . however improbable that theory may seem, so long as the most favorable construction of the evidence supports it,' *State v. Kinard,*

Mo., 245 S.W.2d 890; 'supported by evidence,' *State v. Robinson,* supra [Mo., 328 S.W.2d 667]; 'any theory of the case which his evidence tended to establish,' *State v. Stallings,* 326 Mo. 1037, 33 S.W.2d 914; 'established defense,' *State v. Sumpter,* Mo., 184 S.W.2d 1005; and 'evidence to support the theory,' *State v. Shiles,* Mo., 188 S.W.2d 7." *State v. McQueen,* 431 S.W.2d 445, 448 (Mo.1968).

█ "Taking human life in self-defense is an affirmative, intentional act," founded in real or apparently real necessity. *State v. Singleton,* 77 S.W.2d 80, 83 (Mo.1934); *State v. Parker,* 403 S.W.2d 623 (Mo.1966). When self-defense is in issue, it is important to determine who was the aggressor and the reasonableness of the actor's fear.

Considering the defendant's testimony first, there is no indication that the stabbing was an intentional act of defendant taken while acting "under at least an apparent necessity, in order to save himself from death or great bodily harm." *State v. Parker, supra.* Defendant not only failed to make any claim that he thought it necessary to use deadly force, but he also disclaimed doing the homicidal act at all. See *State v. Singleton, supra.* There is no evidence from defendant's testimony, which constituted a claim of innocence, that he acted under real or apparent necessity.

█ However, "where evidence in the case other than the defendant's testimony raises an issue of self-defense the court must submit that issue to the jury, even though such defense is inconsistent with the defendant's testimony and arises upon facts and circumstances denied by him." *State v. Singleton, supra,* 77 S.W.2d at 84; *State v. Gaultney,* 146 S.W. 1153 (Mo.1912). The State's evidence does not in any way raise this issue. Concisely stated, the evidence indicates that defendant and deceased were slapping at one another, defendant *removed* himself from the place of struggle, and then reentered and *renewed* the struggle, stabbing the deceased approximately 30 times.

█ The force used in self-defense must not exceed the bounds of what is

**250**

necessary or reasonably appears necessary for defense or prevention. 40 C.J.S. Homicide § 131. If the slayer's act is clearly excessive or entirely disproportionate to the assault made on him, the law will deem him the aggressor. 40 C.J.S. Homicide § 131. Further, where the accused continued or *renewed* the struggle when he had an opportunity to abandon or decline further, he became the aggressor, irrespective of whether he was at fault with the original difficulty, and is not justified in claiming self-defense. 40 C.J.S. Homicide § 133. One who is the aggressor in the difficulty in which he killed another cannot claim self-defense unless he previously withdrew from the altercation so as to have shown his intention in good faith to decline further combat. *State v. Sherrill,* 496 S.W.2d 321, 325 (Mo.App.1973); 40 C.J.S. Homicide § 117.

 Rather than desisting, defendant returned to the "slapping", using brutal and excessive force. There is no evidence in the record, or inferences therefrom, that warrant an instruction on self-defense.

The trial court correctly refused to submit a self-defense instruction. The judgment is affirmed.

CLEMENS, P. J., and STEWART, J., concur.